## AYCOCK et al. v. GREEN.
### No. 9812.

Court of Civil Appeals of Texas.
San Antonio.

May 6, 1936.

Rehearing Denied June 3, 1936.

Webb & Webb, of Sherman, J. T. Canales, of Brownsville, and C. J. Shaeffer, of Dallas, for appellants.

Abney & Whitelaw, of Brownsville, for appellee.

BOBBITT, Justice.

In February, 1933, J. P. Aycock and Joe Carver, residents of Collin county, went to Raymondville, in Willacy county, to purchase a supply of onion plants. At Ray-

mondville they contacted Ted Green, appellee herein, who took them in his Chevrolet coupé and showed them various onion beds in the vicinity, where plants were for sale, apparently through appellee's agency. It is undisputed that early in the afternoon of February 20th, having completed the business in hand, and having purchased and drunk, among themselves, two pints of mescal, a highly potent Mexican intoxicant, and under the exhilarating influence of that beverage, the trio agreed to pay a visit to the city of Matamoros, seventy miles south, and just across the Rio Grande, in Old Mexico, from the city of Brownsville, Tex. Accordingly, they bought more mescal, and passing the bottle around among themselves as they got underway to Matamoros, the three soon became intoxicated. Appellee did the driving during the morning, and was driving when they left Raymondville in the afternoon. They continued to drink, at apparently short intervals, until they passed the town of Lyford, a few miles below Raymondville; but from the meager record of their conduct they were then so far gone in intoxication that none could say what thereafter occurred among them. It seems, however, that up to that time the two guests had suggested to appellee to slow his speed or he might cause a wreck; that at that time he was driving "fast," and "wobbling" the car on the roadway. If appellee continued these indiscretions after leaving Lyford, there is no direct evidence of the fact in the record. It is shown that up to that time the three had participated at each passing of the bottle, and all were equally intoxicated. One of the guests, Carver, and the only one who testified, had a vague recollection that at or near Harlingen, about halfway down to Matamoros, the three got out of the car, and Carver held appellee's head while he vomited. The witness did not know who was then or thereafter driving; whether himself, or appellee, or Aycock, the other guest; he knew nothing more until he recovered consciousness in a Brownsville hospital, many hours later.

The party proceeded down the highway through Harlingen, and on through San Benito. A few miles below San Benito, their car overtook and passed safely around a car driven in the same direction, by a lady, who testified that their car was traveling at "moderate speed, pretty good speed." Two miles still farther down, and within five miles of Brownsville, the party overtook and passed around a small truck, traveling in the same direction, but in getting back over on the right side of the road, the right rear of the coupé collided with the left front of the truck, skidding the latter over on the right shoulder of the roadway, bending the fender of the truck, and breaking its axle. The coupé caromed down the roadway to the left, turned end-over-end, coming to rest in an upright, but reverse, position, its motor still running. A deputy sheriff, coming up the highway from Brownsville in his car at the moment, witnessed the accident; got out, ran to the coupé, turned off the ignition switch, and found Aycock, sprawled over the middle of the seat with his head through the rear window, dead with a broken neck. It appears that Carver, the other guest, was slumped at the steering wheel, his feet positioned as if he had been driving the car. Appellee was slumped at the right end of the seat, with Aycock between and Carver on the left at the wheel. Both appellee and Carver were badly injured, Carver having a broken clavicle. Both were apparently unconscious, although Carver begged that "something be done for his leg," and one of them (not identified) said, "Pick him (not identified) up first, he is hurt worse than I." The deputy sheriff testified that at the time of the collision the coupé was moving "at a pretty rapid gait." The dead and injured were carried to a Brownsville hospital. Two hours later, appellee, when questioned in the hospital by an officer, said he was driving the car at the time of the accident, although some months after leaving the hospital Carver asked appellee if he knew who was driving when the accident occurred, and appellee said he did not know.

Subsequently, Mrs. Aycock, widow of the decedent, brought this suit in her own behalf and that of two minor children, to recover of Green, the owner of the death car, for the wrongful death of the husband and father. Upon the trial, and at the close of plaintiff's testimony, the trial judge directed a verdict against Mrs. Aycock, who has appealed from the resulting adverse judgment.

It seems clear to us that this case is ruled by the so-called "guest" statute, the pertinent part of which is as follows:

"Art. 6701b. Liability for injuries to gratuitous guest in motor vehicle limited;
* * *

"Sec. 1. No person transported over the public highways of this State by the owner or operator of a motor vehicle as his guest without payment for such transportation, shall have a cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator, or caused by his heedlessness or his reckless disregard of the rights of others." Acts 1931, 42d Leg., p. 379, c. 225 (Vernon's Ann.Civ.St. art. 6701b, § 1).

When nonessentials are laid aside, the case presents, as we view the matter, the clear-cut issues of: (1) Whether the alleged contributory negligence of the decedent could be urged as a defense by appellee, and (2) whether the evidence was sufficient to support a jury finding that the injury resulting in the death of the guest, Aycock, was "intentional on the part of" appellee, "or caused by his heedlessness or his reckless disregard of the rights of others," within the meaning and contemplation of the statute in question.

■ The burden was upon appellant to show by affirmative evidence that appellee was guilty of the degree of negligence condemned by the statute. Munvez v. Buckley (Tex.Civ.App.) 70 S.W.(2d) 605.

It is our opinion that the question of contributory negligence is not in the case, for two good and apparent reasons:

■ First. Assuming, for the purpose of this conclusion, that appellee was the operator as well as the owner of the death car, and was guilty of only ordinary negligence, as distinguished from wanton negligence condemned by the statute, he would not be liable for the death of his guest, regardless of the latter's conduct, or negligence. This is true because of the express purpose and provision of the guest statute.

■ Second. Contributory negligence is not a defense to a cause of action for injury resulting from the intentional or wanton acts of another, such as is preserved to guests by the statute in question. 30 Tex.Jur. p. 671, § 25; Perkins v. Nail (Tex.Civ.App.) 37 S.W.(2d) 211, and authorities there cited; Bordonaro v. Senk, 109 Conn. 428, 147 A. 136; Grant v. MacLelland, 109 Conn. 517, 147 A. 138;

Note, 74 A.L.R. 1198. The Connecticut authorities are deemed specifically in point, and controlling, in cases arising in Texas under our guest statute, because the statute of that state, it seems clear, was copied as the Texas statute upon the same subject, and it will be presumed that our Legislature adopted the construction placed upon the law by the courts of that state. 59 C.J. 1065; 9 Tex.Jur. p. 429, § 19; Travelers' Ins. Co. v. Marshall, 124 Tex. 45, 76 S.W.(2d) 1007, 96 A.L.R. 802.

If the question here raised were new, we would be inclined to hold that ordinary negligence on the part of the injured person, which is a proximate cause of the loss or injury, is not a bar to recovery where the injury is caused by the gross negligence or reckless misconduct of the defendant, but that gross negligence on the part of the injured person for his own safety will bar recovery under like circumstances. Restatement of the Law of Torts, vol. 2, § 482, p. 1261.

■ This, however, seems to be the rule of comparative negligence which has repeatedly been rejected by the courts of this state. 30 Tex.Jur. p. 754, and cases there cited. In Andrews v. Mynier, 190 S.W. 1164, 1165, this court said: "The rule of comparative negligence does not exist in Texas, except as between common carriers and their employees. In all other cases of injuries resulting from negligence, contributory negligence is an absolute defense, no matter how negligent the defendant may have been. Article 6649, Rev.Stats.; San Antonio Brewing Ass'n v. Wolfshohl [Tex.Civ.App.] 155 S.W. 644.

This question was fully considered and determined by the Supreme Court of Texas in McDonald v. International & G. & N. Ry. Co., 86 Tex. 1, 22 S.W. 939, 944, 40 Am.St.Rep. 803. Judge Gaines, speaking for that court, said: "The doctrine that any degree of negligence which may be gross on part of a defendant will enable a plaintiff to recover, notwithstanding his own negligence, is unsound in principle. The damages allowed by law for a wrong negligently inflicted are given, except in peculiar cases, as a compensation, and not as a punishment, for the injury. Where the plaintiff's own negligent conduct has contributed to the injury,—that is to say, but for his own negligence, the damage would not have occurred,—to allow him compensation for his loss would be to com-

pensate him for his own negligent misconduct. It is true that in case of gross negligence exemplary damages may be allowed, but the rule in this state is that, where there is no actual damage, exemplary damages cannot be recovered."

In so far as we have been able to determine, this rule has never been changed in our state.

██ We are of the opinion that the evidence was not sufficient to warrant submission to a jury of the question of whether appellee was guilty of the character or degree of negligence which would render him liable under the provisions of the statute. This conclusion calls for an analysis of the evidence.

In the first place, it is extremely doubtful if the evidence was sufficient to support a finding that appellee was actually driving his car when the accident occurred. It is true that in answer to questions put to him by an officer shortly after he was put in the hospital, appellee stated that he was driving the car when the collision occurred, although when discussing the matter with his surviving guest some weeks or months afterwards, he stated that he did not know who was driving. The surviving guest, who has a suit like this pending against appellee, testified he had no recollection of who was driving. Ordinarily, the admission made by appellee was sufficient primary evidence to establish the fact, prima facie. But in view of the fact that appellee was badly injured, and rendered unconscious in the accident, and had just been lodged in the hospital, with no showing that he had fully recovered consciousness, or was not then under the influence of any opiate, it would require but slight evidence to overcome the prima facie case made by his admission under the circumstances.

Against this prima facie showing was the physical fact that when his car came to rest from the collision, appellee was on the far end of the seat from the steering wheel, with the decedent between him and the wheel, and with Carver, the surviving guest, unconscious at the wheel, with his feet arranged in the position of a driver. These physical facts, which appear to be positive and undisputed, make it impossible to rationally conceive that appellee was driving the car at the time of the accident. It is true that appellee was driving when the party left Raymondville. But it is equally true, according to Carver's hazy recollection, that the three got out of the car somewhere below San Benito on the way to permit appellee to vomit, and when they got back in the car and were again on their way, who then took the wheel is not clearly shown. Was appellee, the sickest one of the three, and who was vomiting, replaced at the wheel by Carver, who was at least sober enough to aid appellee in his distress? All the physical facts indicate that change in drivers, and indicate, with equal force, furthermore, that appellee did not resume the wheel; or, certainly and in any event, as stated by an impartial witness, the deputy sheriff, that he was not driving when the collision occurred. If appellee was not driving at that time, then he was not liable in the case, and the court properly directed a verdict in his favor.

██ But, assuming, for the purpose of passing upon the question of wanton negligence, that appellee was driving the car, we proceed to consider that question. What intentional or wanton acts of appellee proximately caused the accident? And, first, was appellee driving the car at an unlawful speed or at an excessive and unusually dangerous speed, at the time? If so, the record does not, in our opinion, show the fact sufficiently to take that issue to the jury. Carver, the surviving guest, and the plaintiff in a similar suit, testified apparently very frankly. He admitted that he was so intoxicated that he remembered little, if anything, that transpired after they passed Lyford, a few miles below Raymondville, except that he had a vague recollection of all the parties getting out of the car near Harlingen, to permit appellee to vomit. He testified that once, or possibly more than once, he and the decedent cautioned appellee, who was driving rapidly and waveringly. This must have been before they passed Lyford, because appellee remembered no incident thereafter, except that they all got out at some place along the road. This testimony had no competent bearing upon the issue of speed, or reckless driving at or near the time of the accident. It can mean no more than that they were going "rapidly" and waveringly soon after leaving Raymondville, when they were passing around the bottle for the last recorded time. We next hear of the party two miles before they reached the scene of the

accident. There they overtook and passed safely around the car driven by the lady, who was traveling thirty-five miles per hour. They were then traveling, according to her testimony, "at a moderate speed, a pretty good speed." There was nothing in that incident, or the evidence of it, that the death car was moving at an unlawful, or excessive, or dangerous, rate of speed, or that it was wavering, or "wobbling," or was being operated in any other than an ordinary speed or manner under such circumstances. The next record of the car's progress was at the scene of the accident, of which there were three eyewitnesses, two occupants of the truck, and a passing deputy sheriff. The only evidence concerning the speed of the car was the testimony of the deputy, who said the car was going at a "pretty rapid gait," which is a purely relative term, from which, alone, no jury could convict the driver of operating the car at an unlawful, or excessive, or unusually dangerous speed. The driver of the truck did not testify. His passenger did testify, for appellant; but did not undertake to estimate the speed of the car, or the manner in which it was being operated. The deputy sheriff, also a witness for appellant, was likewise silent on the latter issue. The maximum sum total of the evidence upon the question of speed and manner of operation in the vicinity of the scene of the collision, then, was that the car was being operated at a "moderate, pretty good, speed," but presumably in a careful manner, as it passed around the lady's car a few minutes before the accident, and that it approached and started around the truck, presumably in an ordinarily careful manner, at a "pretty rapid gait"; but that after passing the truck it was cut back to its proper side of the roadway a fraction of a second and a few inches too soon, and, failing to clear, collided with the front of the truck. By that last movement, by that slight miscalculation of distance, the grievous tragedy was accomplished. Was the immediate act, of cutting the car back to its rightful path a second too soon, a piece of "ordinary negligence," as that term is universally considered, or did it show, affirmatively—as it must have been shown to be actionable under the statute —that it was done by the driver of the ill-fated car (whether guest or owner) intentionally, wantonly, or in heedless disregard of the lives of his congenial, convivial companions?

We have concluded that the evidence, which we have endeavored to state fairly and fully, was not sufficient to show, affirmatively, that the negligent act which caused the accident was "intentional on the part of the operator of the car," or was attributable to "his heedlessness or his reckless disregard of the rights of others," within the contemplation of the guest statute. The trial court therefore, we conclude, did not abuse his discretion in directing a verdict for appellee.

We are not unmindful of the wise criminal statutes which prohibit persons from operating motor vehicles on the public highways of Texas while under the influence of intoxicants, or in excess of prescribed speed limits, nor of the grave reprehensibility of such conduct, regardless of the statutory inhibitions. But, as we view the case, those considerations cannot affect the decision here, and we perceive no reason for discussing them in this case. The controlling question is one of evidence, which we deem insufficient, under the law, to raise jury issues.

The record at large raises the constantly recurring question of whether a willing and active participant, such as the decedent in this case, can be heard to complain of fortuitous consequences occurring to him in an escapade of this nature, in which all the participants join, deliberately and voluntarily, with equal zest and with full knowledge of its possibilities for an unhappy ending. Our courts have many times held, with obvious reason, that in such cases a victim of the folly (or his unfortunate survivors) cannot recover of his fellows, whom he had joined wholeheartedly in producing the very result which all had equal opportunity of foreseeing and avoiding. Berry, Automobiles (4th Ed.) §§ 596, 597, and authorities.

Finding no error on the part of the trial court, its judgment herein will be affirmed.